Michael **BORGENS** o/b/o, Lisa **BORGENS,** Plaintiff,

v.

William A. **HALTER,** Commissioner of the Social Security Administration, Defendant.

No. 6:99CV1414ORL19JGG.

United States District Court, M.D. Florida, Orlando Division.

March 28, 2001.

Richard Allen Culbertson, Law Office of Richard A. Culbertson, Orlando, FL, for Michael Borgens, Lisa Borgens.

Susan R. Waldron, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Roberto H. Rodriguez, Jr., U.S. Attorney's Office, Middle District of Florida, Orlando, FL, for William A. Halter.

### ORDER

FAWSETT, District Judge.

This cause came before the Court on the following matters:

(1) The Plaintiff's Memorandum in Support of Petition for Judicial Review (Doc. No. 16, filed May 1, 2000); the Defendant's Memorandum in Support of the Commissioner's Decision (Doc. No. 17, filed June 12, 2000);

(2) The Report and Recommendation of United States Magistrate Judge James G. Glazebrook Recommending that the Commissioner's Decision Be Affirmed (Doc. No. 23, filed January 19, 2001); the Plaintiff's Objections to the Report and Recommendation (Doc. No. 24, filed January 29, 2001); and the Defendant's Response to Plaintiff's Objections to Magistrate Judge's Report and Recommendation (Doc. No. 25, filed February 15, 2001).

### BACKGROUND

Plaintiff, Michael Borgens acting on behalf of his minor daughter, Lisa Borgens, applied for Supplemental Security Income Benefits on November 21, 1995. A hearing concerning the Plaintiff's claim was held before Administrative Law Judge Kevin F. Foley (the "ALJ"), and the testimony of Michael Borgens and behavioral tutor Maria McQuade was taken. Based on the testimony and Lisa Borgen's medical and school records, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision was reviewed and affirmed by the Appeals Council.

The Plaintiff made timely application to this Court for review of the Commissioner's decisions. Pursuant to Local Rule 6.01, the matter was referred to United States Magistrate Judge James G. Glazebrook, and in a well-reasoned Report and Recommendation, Magistrate Judge Glazebrook recommended that the Commissioner's decision be affirmed. *See* (Doc. No. 23). The Plaintiff timely objected to the Report and Recommendation. *See* (Doc. No. 24).

The Plaintiff contends that the Report is flawed because: (1) the case should be remanded for the purpose of complying with 20 C.F.R. §§ 416.926a(e)(1)(ii), 416.926a(e)(4)(ii), 416.926a(e)(4)(ii)(B), and 416.926a(f);[1] (2) the Commissioner's decision is not supported by substantial evidence; and (3) the Appeals Council failed to issue a final decision based on a full consideration of all the evidence currently on the record. *See* (Doc. No. 24). In the thirty-three page Report, Magistrate Judge Glazebrook thoroughly addressed the issues on which the Plaintiff bases his objections. *See* (Doc. No. 23). In this regard, after considering the Record before the Court and the applicable law, the Court finds that Magistrate Judge Glazebrook correctly states the facts and law applicable in this case with one modification. *See* (Doc. No. 23).[2]

---

1. The Report expressly found that these new regulations are applicable in the instant case. *See* (Doc. No. 23, at 9) (stating that "the regulations presently in force [are] undisputably applicable to Lisa Borgens").

2. The standard deviation figure describes the probability that the measured disparity is the result of mere chance. *Engineering Contractors Ass'n of S. Fla. Inc. v. Metropolitan Dade County,* 122 F.3d 895, 914 (11th Cir.1997).

## STANDARD OF REVIEW

If supported by substantial evidence, the Commissioner's decision cannot be reversed "[e]ven if [this Court would] find that the evidence preponderates against the secretary's decision." *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986). "Substantial evidence is more than a scintilla. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* Although findings of fact are given deference, the courts must not presume that the Commissioner followed the appropriate legal standards "or that the legal conclusions reached were valid." *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996) (stating that the courts are to "conduct 'an exacting examination' of [the legal] factors").

## ANALYSIS

As noted in the Report, a child establishes her right to SSI benefits by demonstrating that, of the six areas of functioning, the child has an " 'extreme' limitation in one area . . . [or a] 'marked' limitation in two areas. . . ." (Doc. No. 23, at 11 (citing 20 C.F.R. § 416.926a(b))). The six areas of functioning are: "cognition/communication ability; motor ability; social ability; responsiveness to stimuli (birth to age one only); personal ability (age three to age eighteen only); and concentration, persistence, or pace (age three to eighteen only)." *Id.;* 20 C.F.R. § 416.926a(e)(4). Here, the Commissioner made the following findings with regard to Lisa's functioning: (1) Lisa has a "marked" limitation in the area of concentration, persistence, or pace; (2) Lisa has a slight to moderate limitation in cognitive/communicative functioning, social functioning, and personal functioning; and (3) Lisa has no deficiencies in the motor development functional domain.

The Court finds that the ALJ did not follow the law in determining that Lisa had only a slight to moderate limitation in cog-nitive/communicative functioning. Specifically, the Court finds that the ALJ erred in failing to properly consider Lisa's results on the Comprehensive Test of Basic Skills (the "CTBS"). As a result, this case should be remanded under sentence four of Title 42, United States Code, section 405(g) for proper development of the record. *See Jackson v. Chater,* 99 F.3d 1086, 1092 (11th Cir.1996).

Lisa took the CTBS in April of 1997. The results indicated that of all of the children in the United States who took the CTBS, Lisa was in the bottom two percent in math total, the bottom one percent in math comprehension, and the bottom five percent in math concepts. *See* Record, at 297. Lisa was also in the bottom six percent in reading total, the bottom four percent in vocabulary, and the bottom seven percent in comprehension. *Id.* Pursuant to 20 C.F.R. § 416.926a, the Commissioner is required to consider such formal testing in evaluating an applicant's functioning. The pertinent regulations provide:

> (ii) The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we *will* consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.
>
> \*     \*     \*     \*     \*     \*
>
> (iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test

designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

\* \* \* \* \* \*

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an 'extreme' limitation when you have a valid score that is three standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

\* \* \* \* \* \*

(4) How we will consider your test scores.

(i) [W]e will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain.

(ii) We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.

\* \* \* \* \* \*

(iii) If there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it. *The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test. But it is also our responsibility to ensure that the evidence in your case is complete and consistent or that material inconsistencies have been resolved.* Therefore, we will use the following guidelines when we resolve concerns about your test scores:

(A) We may be able to resolve the inconsistency with the information we have. We may need to obtain additional information; e.g., by recontact with your medical source(s), by purchase of a consultative examination to provide further medical information, by recontact with a medical source who provided a consultative examination, or by questioning individuals familiar with your day-to-day functioning.

(B) Generally, we will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning. *When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision.*

20 C.F.R. §§ 416.926a(e)(1)(ii), .926a(e)(2)(iii); .926a(e)(3)(iii), and .926(e)(4) (emphasis added).

Despite the importance of standardized testing such as the CTBS, the ALJ did not make a determination as to the significance of Lisa's obviously low scores. The ALJ's failure in this regard was contrary to the above regulations and to his basic duty to fully develop the record. *See Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir.1981) (explaining that "[b]ecause a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record.... This duty requires the ALJ to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts' ").

Rather than determine the significance of Lisa's CTBS scores, i.e. the number of standard deviations,[3] the ALJ ordered a

---

**3.** "The standard deviation figure describes the probability that the measured disparity is the result of mere chance." *Engineering Contractors Ass'n of South Florida Inc. v. Metropoli-*

consultative psychological evaluation. *See* (Doc. No. 23, at 24–25) ("Concerned with Lisa's standardized test scores and report card, the ALJ ordered a consultative psychological evaluation of Lisa to assess her intellectual functioning."). While the Court does not find that the ALJ erred in obtaining a consultative examination, such examination did not satisfy the ALJ's duty to consider the results of the CTBS and to explain what if any weight was given to such test results and the reason for such valuation. As a result, remand of this case for further development of the record is warranted.

### CONCLUSION

Based on the foregoing, the Court rules as follows:

(1) The Report and Recommendation of the United States Magistrate Judge James G. Glazebrook (Doc. No. 23) is **ADOPTED IN PART AND REJECTED IN PART.**

(3) The decision of the Commissioner is **REVERSED AND REMANDED.**

(4) The Clerk is directed to enter Judgment in favor of Plaintiff and against the Defendant.

(5) The Clerk is directed to **CLOSE** this case.

### Report and Recommendation

GLAZEBROOK, United States Magistrate Judge.

Michael Borgens, on behalf of his daughter, Lisa Borgens, appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of Supplemental Security Income Benefits. *See* Docket No. 1. For the reasons set forth below, the Commissioner's decision should be **AFFIRMED.**

*tan Dade County*, 122 F.3d 895, 914 (11th Cir.1997).

### I. *PROCEDURAL HISTORY*

On November 21, 1995, Mr. Borgens protectively filed a claim for disability benefits, on behalf of his daughter, Lisa Borgens, claiming disability as of August 15, 1994. R. 86. Mr. Borgens' claim was denied upon initial consideration and reconsideration. Mr. Borgens requested a hearing before an administrative law judge. On August 6, 1997, the Honorable Kevin F. Foley, Administrative Law Judge ["ALJ"], held a full hearing on Lisa's claim in Orlando, Florida. R. 38—85. Fran J. Gonzalez, a non-attorney, represented Lisa at the hearing. R. 25.

On January 15, 1998, the ALJ issued his decision that Lisa was not entitled to supplemental security income benefits. R. 22—31. Following his review of the medical and other record evidence, the ALJ found that Lisa suffered from attention deficit disorder with hyperactivity. R. 30, ¶ 3. While the ALJ considered Lisa's condition to be "severe", he ruled that Lisa's impairments did not meet or equal any listed impairment under Appendix I to Subpart P of the Administrative Regulations Part 404. R. 30, ¶ 5. He also concluded that Lisa's impairments were not functionally equivalent in severity to any listed impairment. R. 30, ¶ 5. Based on the finding that Lisa was not disabled, the ALJ concluded that Lisa is not entitled to child's supplemental security income benefits. R. 31. *See generally,* 20 C.F.R. § 416.924.

On June 24, 1999, after considering additional evidence, including medical evidence from Dr. Lopez and a teacher evaluation from Linda Hudick [*see* R. 314—51, 354—59], the Appeals Council granted the request for review of the ALJ's decision. R. 352. On that same date, the Appeals Council notified claimant that it would consider

any new comments and material evidence that the claimant submitted within thirty days from the date of the notice. R. 352. On September 23, 1999, after considering additional evidence, the Appeals Council adopted the ALJ's opinion as the final decision of the Commissioner. R. 7.

On November 3, 1999, Mr. Borgens timely appealed the Appeals Council's decision adopting the ALJ's decision to the United States District Court. Docket No. 1. On May 1, 2000, Mr. Borgens filed a memorandum of law in support of Lisa's appeal. Docket No. 16. On June 12, 2000, the Commissioner filed a memorandum in support of his decision that Lisa was not disabled. Docket No. 17. This Court heard oral argument of the appeal on November 29, 2000. The appeal is ripe for determination.

## II.  *THE PARTIES' POSITIONS*

Mr. Borgens assigns five errors to the Commissioner. First, Mr. Borgens claims that the Commissioner's finding regarding Lisa's functional abilities is not supported by substantial evidence. Second, Mr. Borgens claims that the Commissioner improperly weighed the medical conclusions of the treating physicians and psychologists. Mr. Borgens contends that the Commissioner improperly disregarded medical evidence showing that Lisa had a *marked limitation* in the areas of social and personal functioning and an *extreme limitation* in the area of concentration, persistence, or pace. Third, Mr. Borgens claims that the ALJ failed to consider the report from Lisa' teacher, Ms. Larsen, the testimony of the behavioral tutor, Maria McQuade, or the results of the standardized skills test that was used to measure Lisa's functional ability. Docket No. 16 at 10. Fourth, Mr. Borgens claims that the ALJ was biased, because he commented that the had a son who had been diagnosed with attention deficit hyperactivity disorder and was on medication for his condi-

tion. Fifth, Mr. Borgens claims that the Appeals Council incorrectly determined that the new medical evidence from Dr. Lopez did not apply to the period prior to the ALJ decision, and that the Appeals Council failed to consider the report from Lisa's teacher, Ms. Hudick. Docket No. 16 at 12.

The Commissioner argues that substantial evidence supports his decision to deny disability. First, the Commissioner argues that substantial evidence supports the ALJ's finding that Lisa suffered from: a slight to moderate limitation in cognitive/communicative functioning; a slight to moderate limitation in social functioning; a slight to moderate limitation in personal functioning; and a marked limitation in concentration, persistence, or pace. Docket No. 17 at 4—11. Second, the Commissioner argues that there is no indication that the ALJ based his opinion on anything other than the record evidence. Docket No. 11. Third, the Commissioner argues that contrary to Mr. Borgens' representations, the Appeals Council *did consider* the new evidence [*see* R. 7 and 352], but concluded that the new evidence did not show that Lisa's functional abilities were more limited than that found by the ALJ. Docket No. 17 at 12—13.

## III.  APPLICABLE LAW

### A.  *The Standard of Review*

#### 1.  *Affirmance*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.1995),

*citing Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982) and *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord, Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991); *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560; *accord, Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir.1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### 2. Reversal or Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994); *accord Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Bowen v. Heckler,* 748 F.2d 629, 631, 636—37 (11th Cir.1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater,* 99 F.3d 1086, 1089—92, 1095, 1098 (11th Cir.1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson,* 99 F.3d at 1090—91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris,* 621 F.2d 688, 690 (5th Cir.1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler,* 732 F.2d 827, 829–30 (11th Cir.1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler,* 721 F.2d 726, 729 (11th Cir.1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a

sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson,* 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court … may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material – relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson,* 99 F.3d at 1090—92; *Cannon v. Bowen,* 858 F.2d 1541, 1546 (11th Cir.1988); *Smith v. Bowen,* 792 F.2d 1547, 1550 (11th Cir.1986); *Caulder v. Bowen,* 791 F.2d 872, 877 (11th Cir.1986); *see also Keeton v. Dept. of Health and Human Serv.,* 21 F.3d 1064, 1068 (11th Cir.1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson,* 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson,* 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

### 3. Standard of Review for Evidence Evaluated by Appeals Council

After the ALJ's decision – but before the Appeals Council decision – Mr. Borgens submitted additional medical records and educational records covering a period from April 21, 1998 through July 9, 1998. R. 7 and 352. The Appeals Council properly made them a part of the record, considered them in granting review and in adopting the ALJ's opinion. R. 7 and 352. The district court also must consider the new evidence in determining whether the Commissioner erred in adopting the ALJ's decision.

The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. R. 5; 20 C.F.R. § 416.1470; *Parker v. Bowen,* 788 F.2d 1512, 1518 (11th Cir.1986) (en banc). The Appeals Council's decision is subject to judicial review to determine if it is supported by substantial evidence. *Parker v. Bowen,* 788 F.2d at 1517, 1519—20 (Appeals Council had reversed ALJ on its own motion and had not denied review). It is *reversible error* for a district court to consider only the evidence presented to the ALJ – and to ignore the new evidence presented to the Appeals Council – in reviewing a decision of the Appeals Council. *Keeton,* 21 F.3d at 1066.

In this case, Mr. Borgens appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting ad-

---

1. The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson,* 99 F.3d at 1089, 1095 n. 4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

ministrative remedies. In granting review of the ALJ's decision, the Appeals Council considered Mr. Borgens' additional evidence in light of the issues raised in the request for review, considered the applicable statutes and regulations, considered the ALJ's decision, and issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review.

## D. Child Disability Law

In 1996, Congress promulgated new eligibility standards for applicants for child's supplemental security income benefits. The new legislation, known as the Personal Responsibility and Work Opportunity Act of 1996, was signed into law by the President on August 22, 1996. The legislation defines childhood disability as follows:

(i) An individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

(ii) Notwithstanding clause (i), no individual under the age of 18 who engages in substantial gainful activity (determined in accordance with regulations prescribed pursuant to subparagraph (E)) may be considered to be disabled.

42 U.S.C. § 1382c (a)(3)(C). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments. 42 U.S.C. § 1382c(a)(3)(G). In determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a qualified pediatrician or other specialist evaluates the case. 42 U.S.C. § 1382c(a)(3)(I).

Under express statutory authority, 42 U.S.C. § 405(a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Pt. 416, Subpt. I; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir.1997). Effective April 14, 1997, the Commissioner promulgated detailed interim final rules to guide the implementation of the new statute. See Childhood Disability Provisions, 62 Fed. Reg. 6408 (1998). The regulations presently in force—and undisputably applicable to Lisa Borgens—are codified at 20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a.

The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets or medically or functionally equals the severity of a listing in the listing of Impairments in Appendix 1 of Subpart P of Part 404 (the Listing)." 20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a. The regulations set forth the steps now used in determining disability for children. 20 C.F.R. § 416.924:

We follow a set order to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impair-

ments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a).

Thus, a three-part test is established for determining a child's disability. The first determination is whether the child is working and performing substantial gainful activity, 20 C.F.R. § 416.924(b). If the child is not working, it must then be determined whether the child suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairment(s) meet, medically equal, or functionally equal an impairment listed under Appendix I to Subpart P of the Administrative Regulations Part 404. 20 C.F.R. § 416.924(d). Age, functioning, and other factors are evaluated in determining whether a child meets a listing. 20 C.F.R. §§ 416.924a–416.924c. Provisions for medical equivalence are established under 20 C.F.R. § 416.926.

Provisions for functional equivalence are established under 20 C.F.R. § 416.926a. Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning. 20 C.F.R.

§ 416.926a (b). There are six areas of functioning to be considered: cognition/communication ability; motor ability; social ability; responsiveness to stimuli (birth to age one only); personal ability (age three to age eighteen only); and concentration, persistence, or pace (age three to age eighteen only). 20 C.F.R. § 416.926a (c)(4).

An "extreme" limitation is present when standardized tests contained in the record are used as the measure of functional abilities and contain a valid score three standard deviations or more below the norm for the test, or when a child from age three to attainment of age eighteen has no meaningful function in a given area. 20 C.F.R. § 416.926a (c)(3)(ii)(A), (C). A "marked" limitation is present when the standardized tests contained in the record are used as the measure of functional abilities and contain a valid score two standard deviations or more (but less than three) below the norm for the test, or in a child from age three to attainment of age eighteen, when the degree of limitation "seriously" interferes with the child's ability to function. 20 C.F.R. § 416.926a (c)(3)(i)(A), (C).

### E. *Treating Physicians*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1439–1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991); *Sabo v. Chater*, 955 F.Supp. 1456, 1462 (M.D.Fla.1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it

controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards,* 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler,* 784 F.2d 1073, 1075 (11th Cir.1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir.1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler,* 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

### F. *Developing the Record*

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen,* 854 F.2d 436, 438 (11th Cir.1988); *Cowart v. Schweiker,* 662 F.2d 731, 735—36 (11th Cir.1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C. § 406; *Cowart,* 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart,* 662 F.2d at 735—36. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala,* 44 F.3d 931, 934—35 (11th Cir.1995), *citing Smith v. Schweiker,* 677 F.2d 826, 829 (11th Cir.1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart,* 662 F.2d at 735 (citations omitted).

### G. *Medical Tests and Examinations*

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also*

*Conley v. Bowen,* 781 F.2d 143, 146 (8th Cir.1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir.1988); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

## H. *The Evaluation of Mental Disorders*

The structure of the mental disorders listings for children under age 19 parallel the structure of the mental disorders listings for adults, but it is modified to reflect the presentation of mental disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation applicable to children. The listing for mental disorders in children are arranged in 11 diagnostic categories, including attention deficit hyperactivity disorder (112.11). 20 C.F.R. Pt. 404, Subpt. P, App. 1. A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (motor function, cognitive/communicative function, social function; personal function, and concentration, persistence, or pace). 20 C.F.R. Pt.404, Subpt. P, App. 1. In most functional ar-

eas, there are two alternative methods of documenting the required level of severity: 1.) use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other medical findings. *Id.* The use of standardized tests is the preferred method of documentation if such tests are available. *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal, social, cognitive/communicative functioning, and concentration, persistence and pace. This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases, descriptions of the child's activities of daily living or social functioning given by individuals or treating sources may be insufficiently

detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these children's sustained ability to function. It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the child either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in children with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594(iv).

Mr. Borgens claims that Lisa's condition meets or is medically or functionally equivalent to the listed impairments set forth at 20 C.F.R. Pt. 404, Subpt. P.App. 1, § 112.11 (Attention Deficit Hyperactivity Disorder). The Listing for Attention Deficit Hyperactivity Disorder requires:

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;
AND

B. .... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.11. For children (age 3 to attainment of age 18), Paragraph B2 of 112.02 requires at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02 B. 2.

An individual may meet the separate Listing for mental retardation if he or she has a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing additional and significant workrelated limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

## IV. APPLICATION

### A. *The Facts*

#### 1. *Background*

Lisa was born on July 2, 1989 and was eight years old at the time of the ALJ's decision. R. 26. Lisa's parents are divorced. R. 349. Lisa and her three siblings were taken from her mother because of a problem the mother had with drugs. R. 216. Lisa lived in foster homes and in a group home from the time she was three until October 1995 when her father regained custody of all four of his children. R. 244. Originally, both parents had visitation rights, but Lisa's mother subsequently left town. R. 244. Lisa has not seen her mother since 1993. R. 244.

#### 2. *Educational Summary*

On March 20, 1996, Lisa's first grade teacher, Beverly J. Larsen, completed a school questionnaire. R. 140—46. Lisa was in the first grade on March 20. Ms. Larsen reported that "Lisa has great difficulty focusing on task, and concentration on the simplist (sic) of tasks." R. 145. Ms. Larsen felt that Lisa was capable of doing the work, but that she was working below grade level because she could not stay on task. R. 140—41 and 144. Ms. Larsen reported that Lisa had a problem complying with school rules and staying in

her seat. R. 140 and 145. Ms. Larsen also reported that Lisa did not interact well with other children. R. 145. Ms. Larsen believed that Lisa would be promoted to second grade. R. 140.

On April 8, 1996, Ms. Larsen completed an information sheet indicating that Lisa's behavior was extreme relating to restlessness, overactivity, and leaving her seat unexcused. R. 359. Lisa did not attend to instructions, did not complete work, and had a short attention span "quite a bit." R. 359. Lisa had moderate problems related to making disruptive noise and appropriate social skills. R. 359. Lisa had a "little bit" of a problem with speaking out of turn and disturbing others. R. 359. Lisa demonstrated no problems with defiance or physically aggressive behavior. R. 359.

In April 1997, Lisa took the Comprehensive Test of Basic Skills. R. 296—98. The results indicated that Lisa was below average in all skill areas tested. R. 297. She was in the bottom one percent in math comprehension, bottom five percent in math comprehension, bottom four percent in vocabulary, bottom seven percent in comprehension, bottom six percent in reading total, and bottom two percent in math total. R. 297. While the national standard of deviations were provided for the Comprehensive Test of Basic Skills, Lisa's deviation from the norm was not provided.

Lisa was in the second grade at the time of the August 6, 1997 ALJ hearing, but had to repeat it. R. 48. During the August 6 hearing, Lisa's behavior tutor, Maria McQuade, testified that "Lisa has great difficulty staying on task." R. 77. When Ms. McQuade observed Lisa in her classroom, she saw Lisa get out of her seat and daydream out the window. R. 78. On one occasion, Lisa got up and walked around the class at least three or four times in a thirty to forty-five minute period. R. 78.

Ms. McQuade testified that ninety percent of her case load involves attention deficit disorder ("ADD") and attention deficit hyperactivity disorder ("ADHD") children; that she would rate Lisa's level as high or bad; and, that the Borgens family situation is one of her most difficult cases. R. 81. Maria McQuade also stated that Lisa did not demonstrate aggressive behavior and that she was instead kind. R. 77–78.

On February 9, 1998—just a few days after the ALJ's January 18, 1998 decision—Lisa's second grade teacher, Linda C. Hudick, completed an information sheet regarding Lisa. R. 314—15. This information covered the period between August 1997 and February 9, 1998. Ms. Hudick reported that Lisa had extreme limitations in the area of concentration, persistence, or pace in that she had a very short attention span, could not stay focused or sit still, and her work was incomplete. R. 315. Ms. Hudick also reported that Lisa has marked limitations in the areas of cognitive/communicative function, social function, and personal function. R. 314—15.

### 3. Medical Summary

Lisa participated in family therapy with Gail F. Davis, Ph.D., a psychologist, from August 8, 1994 to March 17, 1997. R. 224—85 and 300—302. Dr. Davis diagnosed Lisa with ADHD combined type. R. 278. In a letter to Social Security dated April 5, 1995, Dr. Davis reported that Lisa is "extremely tuned out much of the time." R. 244. Dr. Davis noted that **medication had helped,** but Lisa continued to have problems at home when not taking the medication and significant problems with memory and understanding caused by her "inability to sustain concentration and to stay with tasks." R. 244—45 (emphasis added). On March 17, 1997, Dr. Davis recommended that Lisa continue

to receive individual therapy and in-home services of a behavior specialist. R. 224.

Numerous physicians and treatment centers treated Lisa for her ADHD. Christine Grissom, M.D. for ADHD treated Lisa at Lakeside Alternatives from September 7, 1994 to February 17, 1995. R. 187—195. Dr. Grissom described Lisa as euthymic. R. 187, 188, 189, 190, 192, and 194. Devereux Florida Treatment Network treated Lisa for ADHD and psychological stressors from March 1, 1995 to September 29, 1995. R. 196—213. Riaz Mazcuri, M.D. treated Lisa on November 27, 1995 and February 5, 1996. R. 214—16. Dr. Mazcuri diagnosed ADHD and recommended continuation on ritalin. R. 216. The Family First Medical Centers, Inc. treated Lisa for ADHD from April 25, 1996 to July 5, 1996. R. 217—20. Jeffery Rocker, D.O. saw Lisa on August 5, 1996. R. 221—23. Dr. Rocker diagnosed ADD and prescribed ritalin. R. 221—23. M. Pastis treated Lisa's ADD from September 30, 1996 to May 12, 1997, R. 286—88 and 294—95.

Lisa received treatment for her ADD at the Central Florida Pediatric Center, and on June 11, 1997 K. Kilgore, M.D. completed a childhood Disability Evaluation Form. R. 291—93. Dr. Kilgore's opined that Lisa was unable to perform normally in a classroom and frequently unable to participate in normal social situations. R. 291. Dr. Kilgore reported that Lisa had a marked limitation in the areas of social and personal functioning and an extreme limitation in the area of concentration, persistence or pace. R. 292.

After the August 6, 1997 hearing, the ALJ arranged for a one time, general evaluation by Lanny L. Bausch, M.S. and William W. Austin, Psy.D. through the State Office of Disability Determinations. R. 305—308. Dr. Austin observed no symptoms of ADHD during the evaluation and presumed that Lisa was stable on her medication. R. 305. The October 31, 1997 diagnoses included specified family circumstance problem, attention deficit disorder, not otherwise specified, adjustment disorder with oppositional tendencies, and developmental articulation disorder. R. 307. Dr. Austin found that with medication, Lisa had less than marked limitations in the areas of cognitive/communicative and concentration, persistence and pace. R. 308.

Frank A. Lopez, M.D. treated Lisa on April 21, 1998 and July 9, 1998. R. 346—51. Over a year later, on August 30, 1999, Dr. Lopez prepared an evaluation. R. 356—58. Dr. Lopez diagnosed Lisa with ADHD, mixed developmental language disorder, central auditory processing disorder, and fine motor incoordination with marked limitations in the areas of concentration, persistence or pace; cognitive/communicative; social; and personal. R. 356—58. Dr. Lopez's evaluation was submitted to the Appeals Council as new evidence.

### B. *Analysis*

The Commissioner found that Lisa suffers from ADHD. The Commissioner reviewed a number of statements and observations about Lisa which had been made by various educators, medical resource persons, and family members. Contrary to Borgens' statements, among the evidence considered by the Commissioner were statements from Lisa's teacher (*see* ALJ's Decision, R. 27–28), Lisa's standardized test (*see* ALJ's Decision, R. 28), and testimony from Lisa's tutor, Lisa McQuade (*see* Appeals Council Decision Granting Review, R. 352).

Based strictly on his review of the subjective assessments, the Commissioner found that Lisa's ADHD condition neither meets nor is medically equivalent to the level of severity specified in Appendix 1 to

Subpart P of Social Security Regulations, No. 4. In addition, the Commissioner found that Lisa's condition does not functionally equal a listed impairment, because she does not suffer from any extreme or two marked limitations in any broad areas of development or functioning. *See* 20 C.F.R. § 416.926a(b)(2). Plaintiff claims that the Commissioner's erred in finding that Lisa's condition does not functionally equal a listed impairment.

As discussed above, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitations in two areas of functioning. 20 C.F.R. § 416.926a(b). The six areas of functioning considered are: cognition/communication ability; motor ability; social ability; responsiveness to stimuli (birth to age one only); personal ability (age three to age eighteen only); and concentration, persistence, or pace (age three to age eighteen only). 20 C.F.R. § 416.926a(c)(4).

### 1. *Cognitive/Communicative Functioning*

Substantial evidence supports the Commissioner's finding that Lisa has only a slight to moderate limitation in cognitive/communicative functioning. Lisa did not have any noted limitations in communicating. Her father testified that she has no difficulty communicating. R. 55—56. Dr. William Austin, who performed a consultative evaluation in October 1997, noted that she had "some mild speech dysfunction" characterized by substituting the "W" sound for the "R" and "L" sounds. R. 305. Apart from this mild problem, Lisa's speech was generally intelligible, logical, and coherent. R. 306.

As for Lisa's cognitive functioning, Dr. Riaz Mazcuri, a psychiatrist, noted in November 1995 that Lisa experienced some academic improvement after she began to take medicine to control her attention deficit hyperactivity disorder. R. 216. In April 1997, Lisa took the Comprehensive Test of Basic Skills. The results indicated that Lisa was below average in all skill areas tested, including vocabulary, comprehension, math comprehension, math concepts, reading, and math. However, the results did not indicate Lisa's number of standard deviations below the test's norm. Concerned with Lisa's standardized test scores and report card, the ALJ ordered a consultative psychological evaluation of Lisa to assess her intellectual functioning. R. 25 at 4.

Mr. Borgens now argues that the consultative psychological evaluation was unnecessary, suggesting that the ALJ ordered it to have evidence to support a finding that she is not disabled. Pl. Br. 14–15. A review of the hearing transcript, however, reveals that the ALJ had valid reasons for ordering the evaluation. At the August 6, 1997 hearing, the ALJ and Lisa's representative discussed the standard deviation of the Comprehensive Test of Basic Skills. R. 42—43, 83—84. Under the regulations, a child can be awarded SSI disability benefits based on the number of standard deviations in standardized tests. *See* 20 C.F.R. § 416.926a (c)(3). Because the evidence in question did not indicate Lisa's number of standard deviations below the norm [R. 297], the ALJ determined that Lisa should have a consultative evaluation for additional testing [R. 84].[2] Lisa's representative at the hearing agreed to the request for a consultative evaluation. R. 84. The hearing transcript shows that the ALJ had sound and valid reasons for ordering this examination.

---

**2.** Similarly, during the November 29, 2000 hearing before the undersigned, Mr. Borgens' counsel was still unable to describe the number of standard deviations below the norm reflected by Lisa's Comprehensive Test of Basic Skills.

Pursuant to the ALJ's order, Dr. Austin administered the Wechsler Intelligence Scale for Children–Third Revision, on which Lisa achieved a verbal IQ of 88, a performance IQ of 94, and a full-scale IQ of 90. R. 306. These scores placed Lisa in the low-average range of intellectual functioning. R. 306. Lisa's scores show no cognitive functional limitation.

Lisa's first grade teacher, Ms. Larsen, stated that, although Lisa had difficulties maintaining her concentration, "[s]he is ... capable of doing the work." R. 141. Lisa' second grade teacher, Linda Hudick, concluded that Lisa had marked limitations in the following functional areas: cognitive/communicative, social, and personal areas. The Appeals Council considered Ms. Hudick's information as new evidence, but properly concluded that Ms. Hudick's explanations did not show that Lisa's abilities are markedly limited. R. 352. For example, Ms. Hudick claimed that Lisa's personal functional area was limited, because Lisa did not dress appropriately for the weather conditions, and she arrived without combing her hair. R. 315. In addition, Ms. Hudick claimed that Lisa had a marked limitation in the cognitive and communicative functional area, because Lisa had difficulty with time-solving problems, had difficulty in making decisions as to right from wrong; and had difficulty in communicating properly with a group during cooperative group time. R. 314—15. Ms. Hudick's explanations do not justify marked or extreme limitations.

However, Lisa's impairment did lead to some academic difficulties: she was required to repeat the second grade. R. 48. A September 17, 1998 school record indicated that Lisa was able to write in complete sentences, but had some difficulty in written expression. R. 324. Lisa was completing her school work, but not hand-ing it in. R. 326. Because of her mild speech impediment, and because of her academic difficulties, the ALJ properly determined that Lisa has a slight to moderate limitation in the area of cognitive/communicative functioning.

### 2. *Social Functioning*

The ALJ also properly determined that Lisa has only a slight to moderate limitation in social functioning. Lisa's first-grade teacher stated in a questionnaire that she is "respectful of adult authority." R. 140. Lisa's father testified that she shows respect for elders, including her minister and other church members. R. 59—60. Maria McQuade, a behavior tutor who worked with Lisa, stated at the hearing that Lisa did not demonstrate aggressive behavior and that she was instead "kind". R. 77—78. Her father testified that she had friends in the neighborhood. R. 58.

However, Lisa does have some difficulties getting along with other children. Her first-grade teacher noted that "[o]ther children shy away from her. They are critical of her." R. 140. She added that Lisa "doesn't interact well with other children." R. 145.[3] Dr. Davis noted that Lisa was getting into trouble with an older girl in the neighborhood; however, by December 1996 the older girl moved away. R. 223. Based on all the evidence, the ALJ correctly determined that Lisa has a slight to moderate limitation in social functioning.

### 3. *Personal Functioning*

The ALJ also properly determined that Lisa has only a slight to moderate limitation in personal functioning. Lisa's father reported to a state agency representative

---

**3.** At the time that this questionnaire was completed, Lisa's teacher noted that she "is not taking any medication and I do see a change in her behavior." R. 146.

that she can dress herself and that she helps her younger brother get dressed "when he lets her." R. 135. She is able to tend to her own hygiene needs, such as bathing and brushing her teeth, although she often requires reminders. R. 60. She does her assigned chores, including unloading the groceries, sorting out the laundry, setting the table, and cleaning her bedroom and the living room. R. 67. According to Dr. Davis' notes from March 1996 that "[a]t home her behavior is generally acceptable." R. 236. The evidence indicates that Lisa has no more than a slight to moderate limitation in personal functioning.

### 4. *Motor Functioning*

The Commissioner properly determined that Lisa had no deficiencies in the motor development functional domain. The medical and other evidence clearly demonstrates no motor development functional deficiency. Plaintiff does not challenge the Commissioner's finding in this regard.

### 5. *Concentration, Persistence, or Pace Limitations*

The Commissioner also properly determined that Lisa has a marked limitation in concentration, persistence, or pace resulting in frequent failures to complete tasks in a timely manner. The most frequent commentator on Lisa's limitations in this area is Dr. Gail Davis who provided counseling to Lisa and her family from August 1994 to March 1997. Dr. Davis initially found that Lisa had significant difficulties maintaining her concentration. Dr. Davis noted in a September 1994 counseling session that Lisa was "extremely agitated. . . . She talked constantly during the session and was unable to sit still." R. 284. Lisa was placed on medication for her ADHD, after which she began to show improvement in increasing her concentration. Dr. Davis noted in October and November 1994 and again in February 1995 that she

was able to control her hyperactivity and to entertain herself without interrupting others. R. 279. In a February 1995 letter, Dr. Davis wrote that Lisa "has calmed down considerably but she still has significant attention problems. . . . She has been able to play independently during visitation which she could not do three months ago when she demanded all the attention." R. 275. Dr. Davis' comments in this letter are explained by her counseling notes from the previous day, in which she stated that Lisa was "very inattentive" during the session but that "[s]he did not appear to have taken her medication." R. 271.

The following month, Dr. Davis found Lisa "much more composed." R. 271. By June 1995, she was "significantly more subdued and manageable at this time." R. 262. She was also "much more orderly in her play and responded much better to instructions." R. 258. Dr. Davis noted in a session the following month that Lisa "talked a little bit about her birthday party. She appears to have enjoyed it immensely. . . . She was playing a game at the same time [while talking to Dr. Davis] and seemed to be able to maintain her attention to follow all the procedures of the game without becoming distracted." R. 258. She found Lisa's attention span "improved significantly." R. 206. In August 1995, Dr. Davis found "great improvement" in Lisa's attention level and general cooperation. R. 255. Dr. Davis noted difficulties in maintaining attention in November 1995, causing her to suggest to Lisa's father that he have the medication adjusted. R. 247—48. By December 1995, Dr. Davis noted that Lisa's medication had been increased and that as a result she "had a very good day today and appeared much calmer." R. 246. Dr. Davis wrote in December 1996 that Lisa "was a little more focused today than she has been historically. She still wants to do

what she wants in the session but she does appear to listen and focus." R. 228.

Other persons also noted that Lisa had improved her level of concentration with medication. Eric Kircher, a therapist, stated in September 1995 that Lisa showed "improvement in following directions and increased cooperation as evidenced by 'waiting her turn'" and that "[t]here has been an increased attention span, improved impulse control and improved frustration tolerance." R. 197. After noting in November 1995 that Lisa was having "severe attentional problems" in school, Dr. Mazcuri, a psychiatrist, stated in February 1996 that she was "doing somewhat better" and was "more focused." R. 214–15. Dr. Maritsa Pastis, a pediatrician, noted in September 1996 that Lisa's father believed that medication had made "a massive difference" in Lisa's and his other children's behavior. R. 287. Dr. Austin noted in his October 1997 evaluation that "[n]o symptoms of ADHD were seen during this evaluation, and she is presumed to be stable on her current medication." R. 305. He also pointed out that she had an attention deficit disorder without evidence of hyperactivity. R. 306. Even Lisa's father acknowledged at the hearing that, with medication, Lisa had shown improvement in maintaining her concentration. R. 51.

The Commissioner properly did not give controlling weight to disability opinions from three different sources. Dr. Davis wrote two letters to the state agency office for disability—one in April 1995 and the other in December 1995—in which she claimed that Lisa's had only been "mildly responsive" to treatment and that her prognosis was only fair. R. 244 and 266. In this instance, Dr. Davis' opinion conflicts with the evidence from other sources, who all noted improved concentration or an absence of attention deficit while on medication. R. 197, 214, 287, and 305.

Her opinion is also contradicted by her own notes, in which she indicated numerous times that Lisa was making progress in improving her concentration. R. 206, 228, 246, 255, 258, 262, 271, 275, 287. Even while claiming that Lisa had only responded mildly to treatment, Dr. Davis still noted that she "has more recently been placed on medication which has helped to focus her attention during school. A recent dosage adjustment has resulted in even better performance at school; however, she continues to have a great deal of difficulty at home when she is not taking the medication." R. 244, 266. Dr. Davis also claimed that Lisa's prognosis was only fair. R. 244, 266. In a letter written to the Florida Department of HRS, however, Dr. Davis stated "[a]ll in all I feel the children have all made progress therapeutically." R. 243. She wrote in March 1997 that "I continue to believe that the prognosis for this family is good." R. 225. Because Dr. Davis' statements about Lisa's response to treatment and her prognosis conflict with her own notes and are not consistent with the other evidence of record, her opinion is not entitled to great weight. *See Edwards v. Sullivan,* 937 F.2d 580, 583 (11th Cir.1991).

A second disability opinion comes from Dr. Kimberly Kilgore, a pediatrician, who completed an assessment on Lisa in June 1997. Dr. Kilgore indicated that Lisa had marked limitations in social and personal functioning and an extreme limitation in concentration. R. 292. As noted by the Commissioner, Dr. Kilgore's opinion conflicts with the findings of Dr. Davis and other sources showing that Lisa was able to improve her condition with medication. R. 30. In addition, it does not appear that Dr. Kilgore had a treating relationship with Lisa on which to base her opinion. Consequently, Dr. Kilgore's opinion and findings are not entitled to great weight. *See Edwards,* 937 F.2d at 583.

The third disability opinion comes from Frank A. Lopez, M.D. On April 21, 1998, Dr. Lopez completed a history, physical examination, neurologic examination, observation, and structured interview with parent and child. R. 348. The clinical findings are set forth in his report. R. 348—51. Over a year later, on August 20, 1999, Dr. Lopez completed an assessment on Lisa. R. 356–58. Dr. Lopez diagnosed Lisa as having ADHD, mixed developmental language disorder, central auditory processing disorder, and fine motor incoordination with marked limitations in the areas of concentration, persistence or pace; cognitive/communicative; social; and personal. R. 356—58. Dr. Lopez also diagnosed Lisa with less than marked limitations in her motor functioning. R. 358.

Dr. Lopez' report was not accompanied by recent supporting clinical findings. The clinical findings in the record are over a year old and did not incorporate a review of Lisa's prior medical records. . See R. 350. In addition, the record does not show whether Dr. Lopez had a treating relationship with Lisa. Nor does the record show whether Dr. Lopez reviewed Lisa's medical records prior to his August 20, 1999 assessment. Moreover, Dr. Lopez' opinion is contradicted by the record and, therefore, it is not entitled to great weight. For instance, Dr. Lopez stated that Lisa had marked limitations in the social and personal functioning areas which is not supported by the evidence. R. 358. Dr. Lopez also stated that Lisa had less than marked limitation in the motor functioning areas, which is wholly unsupported by the evidence. R. 358. Because Dr. Lopez' statements about Lisa's are not consistent with the other evidence of record, his opinion is not entitled to great weight. *See Edwards*, 937 F.2d at 583. Because many sources noted that Lisa's concentration improved with medication and treatment, the Commissioner properly determined that she had a marked but not extreme limitation in concentration, persistence, and pace.

Mr. Borgens' remaining arguments also lack merit. Mr. Borgens claims that the ALJ showed bias at the hearing. Pl. Br. 11–12. A review of the record in this case does not show any indication of bias. To be disqualifying, the alleged bias and prejudice "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In this case, the allegation of bias is centered around the ALJ's comment at the hearing that his own son has been diagnosed with attention deficit hyperactivity disorder and is on medication for this condition. R. 57. There is no indication at all that this information had any effect on the ALJ's finding that Lisa does not meet the statutory definition of disability. Instead, the ALJ's hearing decision reveals that he relied on all the relevant evidence and testimony in making his decision. Lisa has failed to carry her burden of proving bias.

After the ALJ issued his hearing decision, Lisa submitted additional evidence to the Appeals Council. R. 314—51, 354—59. Contrary to Mr. Borgens' representations, the Appeals Council reviewed and supplemented the record with Lisa's new evidence. In granting review of the ALJ's decision, and later in adopting that decision, the Appeals Council properly considered and distinguished the new evidence, including Dr. Lopez' assessment and Linda Hudick's report. *See* R. 7, 352.

## V. CONCLUSION

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED.** Failure to file written objections to the proposed findings and

recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within eleven days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Any party appealing this decision shall file and serve a copy of the oral argument transcript.