Frances FONTANEZ, for Jennifer
FONTANEZ, Plaintiff,

v.

Joanne BARNHART, Commissioner of
the Social Security Administration,
Defendant.

No. 6:00CV264–ORL–28–JGG.

United States District Court,
M.D. Florida,
Orlando Division.

March 29, 2002.

Jose M. Carrion, Law Office of Jose M. Carrion, Orlando, FL, for Frances Fontanez, o/b/o Jennifer Fontanez, plaintiffs.

Susan R. Waldron, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Mary Ann Sloan, Dennis Williams, General Counsel's Office, Social Security Administration, Atlanta, GA, for Kenneth S. Apfel, Commissioner Social Security Administration, defendants.

## ORDER

ANTOON, District Judge.

This cause is before the Court on review of the final decision of the Commissioner of the Social Security Administration terminating the SSI disability insurance benefits of Jennifer Fontanez effective August 1, 1997.

The United States Magistrate Judge has submitted a Report and Recommendation (Doc. 21) recommending that the administrative decision be reversed and remanded for further proceedings under Sentence Four of 42 U.S.C. § 405(g). Defendant Commissioner has filed an Objection (Doc. 22) to the Report. Plaintiff has not responded to the objection. As more specifically set forth below, after a review of the record in this matter, including the Objection by Defendant Commissioner, the Court agrees with the findings and conclusions in the Report and Recommendation of the Magistrate Judge. Accordingly, this cause will be remanded to the Commission for further proceedings.

In her Memorandum in Opposition to the Commissioner's Decision (Doc. 12), Plaintiff assigned five points of error: (1) that the ALJ improperly determined that Jennifer "has moderate limitation of cognitive/communicative functioning and slight limitation of concentration"; (2) that the ALJ erred in failing to find that Jennifer had a severe impairment; (3) that the ALJ erred in "failing to consider and evaluate the combined effect of the claimant's impairments in determining severity"; (4) that the ALJ erred in "failing to consider the combined effect of the claimant's impairment in determining whether her impairment equaled a listing"; and (5) that the ALJ's decision was not based on substantial evidence. (Doc. 12, at 2).

In the Report and Recommendation, the United State Magistrate Judge noted that the ALJ actually did conclude that Jennifer had a "moderate" rather than "slight" limitation in concentration and ultimately concluded that Jennifer's impairments were "severe." The Magistrate Judge also found that the ALJ indeed considered the combined effect of all of Jennifer's impairments and considered the impairments in combination in determining whether Jennifer's condition met or equaled the listings. However, the Magistrate also concluded that remand was required because the ALJ failed to fully develop the record and failed "to determine the significance of Jennifer's low [test] scores." (Doc. 21 at 33). In reaching this conclusion, the Magistrate Judge stated:

> The ALJ had a duty to fully and fairly develop the record as to Jennifer's impairments so that he could determine whether they functionally equal a Listing. Here, the ALJ had a special duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts and to be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited. The record does not contain sufficient information from Jennifer's medical sources to determine whether Jennifer functionally equaled a Listing.

The record contains limited evidence of formal testing. On May 18, 1993, Michael F. Kirschner, Ph.D., administered to Jennifer a We[chs]ler Intelligence Scale for children. On November 11, 1997, Frank A. Lopez, M.D. at the Children's Developmental Center performed a Visual Motor Integration Test, an Auditory Analysis Skills test, and a Kaufman Brief Intelligence Test. R. 241–43. This formal testing, however, did not provide the ALJ (and the district court) with adequate information about Jennifer's functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Her standard scores were not converted to standard deviations so as to be useful in determining whether Jennifer had a "marked" or "extreme" limitation in a domain. Absent standardized tests that measure functional abilities in terms of standard deviations, a judge cannot usually determine the presence or absence of an "extreme" or "marked" limitation. Contrary to his duty to fully develop the record, the ALJ failed to determine the significance of Jennifer's low scores. This requires remand.

(Doc. 21 at 32–33) (footnotes omitted).

In the Objection to the Magistrate Judge's Report, the Commissioner argues that the record in this case is not incomplete and that the adequately developed record supports the ALJ's determination that Jennifer is not disabled. The Commissioner particularly takes issue with the premise in the Report that "[a]bsent standardized tests that measure functional abilities in terms of standard deviations, a judge cannot usually determine the pres-

ence or absence of an 'extreme' or 'marked' limitation." (Doc. 21 at 33, *quoted in* Doc. 22 at 2). The Commissioner argues that "not all functional criteria can be tested in terms of quantitative tests with standard deviations" and that "not all tests or scales which measure the ability to function can be equated in terms of scores with standard deviations." (Doc. 22 at 4, 5). Although the Commissioner acknowledges that reported standard deviations for Jennifer's test results are absent from the record, the Commissioner contends that the ALJ nevertheless had sufficient evidence available to make the determination whether Jennifer's limitations were marked or extreme.

The Court agrees with the conclusion of the Magistrate Judge that the ALJ erred in not fully developing the record with standard deviation information. The pertinent regulations provide that there are two alternative methods—standardized tests or "other medical findings"—for documenting the severity of most functional areas but that "[t]he use of standardized tests is the preferred method of documentation if such tests are available." 20 C.F.R. Part 404, Subpt. P, App. 1, 112.00(C): "Assessment of Severity." Here, standardized tests had been administered to Jennifer and were therefore available. Considering that "marked" and "extreme" limitations are, in the context of standardized testing, defined in terms of standard deviations,[1] the record should have been developed so that this very meaningful information was included in order that the ALJ could have appropriately considered the significance of Jennifer's test scores in making the determination as

---

1. A "marked" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation

"is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

to disability. *Cf. Borgens v. Halter*, 164 F.Supp.2d 1309, 1313 (M.D.Fla.2001) (remanding for further development of the record so that standardized test results could be considered).

In accordance on the foregoing, it is **ORDERED** as follows:

1. The Report and Recommendation (Doc. 21) is **ADOPTED** and **CONFIRMED** and made a part of this Order.

2. The decision of the Commissioner is hereby **REVERSED** under sentence four of 42 U.S.C. § 405(g), and this case is hereby **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the Report and Recommendation and this Order.

3. The Clerk is directed to enter a separate judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure and thereafter to close the file.

### *Report and Recommendation*

GLAZEBROOK, United States Magistrate Judge.

On behalf of her granddaughter, Jennifer Fontanez ["Jennifer"], plaintiff Frances Fontanez ["Fontanez"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] terminating Jennifer's SSI disability insurance benefits effective August 1, 1997. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision should be **REVERSED and REMANDED under Sentence Four.**

### I. *PROCEDURAL HISTORY*

Fontanez is Jennifer's grandmother and guardian. Fontanez protectively filed an application for childhood Supplemental Security Income ["SSI"] on behalf of Jennifer on June 10, 1992. R. 30, 38—50. She alleged an onset of a learning disability as of Jennifer's date of birth on July 6, 1986. R. 39, 55. The application for SSI benefits

was granted in an initial State Agency determination, and Jennifer was found to be disabled as of June 1, 1992, the month of her SSI application. R. 51. Jennifer was five years old on June 1, 1992. Jennifer had sickle cell disease and a learning disability not otherwise specified. R. 51 – 52. She had a moderate limitation of function in the three domains of cognitive function, communicative function, and concentration, persistence, and pace. R. 53—54.

Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. No. 104–193, 110 Stat. 2105, § 211(d)(2), the Commissioner sought to redetermine Jennifer's disability. In June 1997, the Commissioner notified Fontanez that Jennifer was no longer disabled under the new definition of disability for children. R. 80—82, 191—98. According to the Commissioner, Jennifer's disability ended in May 1997. Her benefits ceased in July 1997, R. 80, when Jennifer was eleven. Fontanez requested reconsideration of the redetermination of Jennifer's disability. R. 83—84. A disability hearing officer again found that Jennifer's disability had ended, but amended the ending date to June 1997, the date of the initial notice that the disability had ceased. R. 85—108, 183–90.

The Honorable Albert D. Tutera, Administrative Law Judge ["ALJ"] conducted a 17–minute hearing on June 25, 1998 in Orlando, Florida. R. 27—36, 109—10. Fontanez was not represented by an attorney at the hearing, although a paralegal appeared as her "representative." R. 10, 27. The ALJ heard testimony from Frances Fontanez. R. 30—34 (five pages of transcript). On September 23, 1998, the ALJ issued his five-page decision finding that Jennifer was not entitled to disability insurance benefits. R. 7—14. Following a brief review of the evidence, the ALJ found that Jennifer's impairments (dys-

thymic disorder, attention deficit hyperactivity disorder, and specific learning disorder) were "severe," but that she did not meet, medically equal, or functionally equal the listing. R. 13, Findings 3, 4. The ALJ found that, at most, Jennifer had moderate limitations in cognitive and social functioning, as well as in concentration, persistence, and pace. R. 13, Finding 5. The ALJ found Frances Fontanez's testimony and subjective allegations "not fully credible" considering the medical and other evidence of record, and concluded that Jennifer was no longer disabled. R. 13, Findings 6, 7.

On January 21, 2000, the Appeals Council denied review. R. 2—3. Jennifer was thirteen years old at the time of the Appeals Council's decision. On February 28, 2000, Fontanez timely appealed the Appeals Council's decision to deny review to the United States District Court. Docket No. 1. On August 23, 2000, Fontanez filed a memorandum of law in support of her appeal of the denial of review. Docket No. 12. On October 5, 2000, the Commissioner filed a memorandum in support of his decision that Jennifer was not disabled. Docket No. 13. This Court heard oral argument of the appeal on July 12, 2001. Docket No. 20. Jennifer is now fifteen years old. The appeal is ripe for determination.

## II. *THE PARTIES' POSITIONS*

Plaintiff Fontanez contends that the Commissioner erred by: 1.) determining that Jennifer has a moderate limitation of her cognitive/ communicative functioning and a slight limitation in her concentration; 2.) failing to find that Jennifer had a severe impairment; 3.) failing to consider and evaluate the combined effect of all of Jennifer's impairments in determining severity; and 4.) failing to consider the combined effect of Jennifer's impairment in determining whether her impairment equaled a listing. The Commissioner argues

that substantial evidence supports his decision to deny disability because Jennifer's condition did not meet the new definition of disability for children, because Jennifer did not meet, medically equal, or functionally equal any listed impairment, and because Jennifer did not have "marked and severe" functional limitations.

## III. *THE STANDARD OF REVIEW*

### A. *Affirmance*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995), *citing Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982) and *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord, Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991); *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560; *accord, Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir.1986) (court also must

consider evidence detracting from evidence on which Commissioner relied).

### B. *Reversal and Remand*

 Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994); *accord Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990). This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala,* 985 F.2d 528, 534 (11th Cir.1993); *accord, Bowen v. Heckler,* 748 F.2d 629, 631, 636—37 (11th Cir.1984).

 The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater,* 99 F.3d 1086, 1089—92, 1095, 1098 (11th Cir.1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson,* 99 F.3d at 1090—91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris,* 621 F.2d 688, 690 (5th Cir.1980) (remand appropriate where record was in-

sufficient to affirm, but also was insufficient for district court to find claimant disabled).

 Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler,* 732 F.2d 827, 829—30 (11th Cir.1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler,* 721 F.2d 726, 729 (11th Cir.1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson,* 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).

 To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the

evidence is material—relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson,* 99 F.3d at 1090—92; *Cannon v. Bowen,* 858 F.2d 1541, 1546 (11th Cir.1988); *Smith v. Bowen,* 792 F.2d 1547, 1550 (11th Cir.1986); *Caulder v. Bowen,* 791 F.2d 872, 877 (11th Cir.1986); *see also Keeton v. Dept. of Health and Human Serv.,* 21 F.3d 1064, 1068 (11th Cir.1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson,* 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson,* 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV. THE LAW

### A. The Old "Comparable Severity" Standard for Childhood Disability

Before 1990, a child was "disabled" if she suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working. 42 U.S.C. § 1382c (a)(3)(1982). On February 20, 1990, the United States Supreme Court decided *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The Supreme Court determined that the Commissioner's childhood SSI disability regulations and rulings had failed to imple-

ment the SSI statute enacted by Congress. The regulations were manifestly contrary to the statute, and exceeded the Commissioner's statutory authority. 493 U.S. at 541, 110 S.Ct. 885.

The statute generally defined disability in terms of an individualized, functional inquiry into the effect of medical problems on an adult's ability to work—or in terms of a "comparable severity" in the case of a child. 493 U.S. at 528—29, 110 S.Ct. 885. The Commissioner, however, had established medical criteria for listed impairments that were more restrictive and more severe than the statutory standard for disability in order to operate as a presumption of disability that makes further inquiry unnecessary. 493 U.S. at 532—33, 539, 110 S.Ct. 885. An adult whose impairment did not meet the listings had the opportunity to show that his impairment in fact prevented him from working, but a child whose impairment did not meet the listings had no similar opportunity. 493 U.S. at 534—35, 110 S.Ct. 885.

The Supreme Court rejected the Commissioner's argument that a functional analysis of childhood disability was not feasible, and that a "listings-only" approach to childhood disability was the only practicable way to determine whether a child's impairment was "comparable." 493 U.S. at 539—40, 110 S.Ct. 885. After *Zebley,* the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis. *See* S. REP. NO. 104-96, 104th Cong., 1st Sess.1995 (available on Westlaw at 1995 WL 351655).

The old statutory and regulatory criteria required the ALJ to apply a four-step

1. The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson,* 99 F.3d at 1089, 1095 n. 4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

evaluation process. *See* 42 U.S.C. § 1382c (a)(3)(A); 20 C.F.R. § 416.924(b); *accord, Wilson v. Apfel,* 179 F.3d 1276, 1278 n. 1 (11th Cir.1999); *Brown v. Callahan,* 120 F.3d 1133, 1134—35 (10th Cir.1997). First, the ALJ had to determine whether the child was engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(c). If so, she was not disabled. If the child was not engaged in substantial gainful activity, the ALJ had to determine whether she had a severe impairment. *See* 20 C.F.R. § 416.924(d). If not, she was not disabled. If the child had a severe impairment, the ALJ had to determine whether that impairment met or equaled an impairment listed in 20 C.F.R. Part 404, subpt. P, app. 1 ["the Listings"]. *See* 20 C.F.R. § 416.924(e). If the impairment met or equaled a listing, the child would be deemed disabled. *See id.* If not, the evaluation would proceed to the fourth step, in which the ALJ would make an individualized functional assessment ["IFA"] to determine whether the child had an impairment or impairments of comparable severity to that which would prevent an adult from engaging in substantial gainful activity. *See* 20 C.F.R. § 416.924(f); *accord, Brown,* 120 F.3d at 1134—35.

## B. *The Legislative History Preceding the New Standard*

The Human Resources Subcommittee of the House promptly took note of the holding in *Sullivan v. Zebley,*[2] and monitored both the Commissioner's implementation of the decision and the decision's effect on the Social Security Administration. H.R. REP. NO. 102–431, 102nd Cong., 2nd Sess. 1992 (available on Westlaw at 1992 WL 35799); *accord,* H.R. REP. No. 103–506, 103rd Cong., 2nd Sess.1994, 1994 U.S. CODE CONG. & AD. NEWS 1494 (available on Westlaw at 1994 WL 188483). As a result of *Zebley,* the Social Security Administration expected to process about 240,000 retroactive *Zebley* claims; 75,000 reconsiderations; 33,000 hearings; and 7,000 Appeals Council reviews. The Commissioner expected to reevaluate 60,000 childhood disability claims denied since the decision, and expected an additional 125,000 blind or disabled children on SSI by the end of fiscal year 1992. *Id.* The Senate Committee on Finance later noted that "the *Zebley* decision was based on limited legislative history and obscure statutory language regarding the children's SSI program, which the Committee is now correcting." *See* S. REP. NO. 104–96, 104th Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

Congress most thoroughly articulates its intent in replacing the "comparable severity" standard with a new definition of childhood disability in the House Conference Report to P.L. 104–193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, dated July 30, 1996. *See* H.R. CONF. REP. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S. CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744).[3] The

---

**2.** The Subcommittee summarized the *Zebley* holding as follows: 1.) in establishing the definition of childhood disability, Congress intended that the Commissioner perform an individualized assessment of the child's functioning when he decides whether the child is disabled, just as he must do for adults; and 2.) although a vocational analysis is inapplicable to children, a functional analysis may be applied to children through an inquiry into the impact of an impairment on the normal, age-appropriate daily activities of a child, such as speaking, walking, washing, dressing, feeding, going to school, playing, and all the other activities in which children normally engage. *Id.*

**3.** *Accord,* H.R. REP. NO. 104–651, 104th Cong., 2nd Sess.1996 (available on Westlaw at 1996 WL 393655 at 2957); H.R. CONF. REP. No. 104–350, 104th Cong., 1st Sess.1995

conference agreement on the definition of childhood disability provides as follows:

The conference agreement follows the Senate amendment. The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition. In those areas of the Listing that involve domains of functioning, the conferees expect no less than two marked limitations as the standard for qualification. The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe" in its common sense meaning.

In addition, the conferees expect that SSA will properly observe the requirements of section 1614(a)(3)(F) of the Social Security Act [42 U.S.C. § 1382c (a)(3)(G) ] and ensure that the combined effects of all the physical or mental impairments of an individual under age 18 are taken into account in making a determination regarding eligibility under the definition of disability. The conferees note that the 1990 Supreme Court decision in Zebley established that SSA had been previously remiss in this regard. The conferees also expect SSA to continue to use criteria in its Listing of Impairments and in the application of other determination procedures, such as functional equivalence, to ensure that young children, especially children too young to be tested, are properly considered for eligibility of benefits.

The conferees recognize that there are rare disorders or emerging disorders not included in the Listing of Impairments that may be of sufficient severity to qualify for benefits. Where appropriate, the conferees remind SSA of the importance of the use of functional equivalence disability determination procedures.

Nonetheless, the conferees do not intend to suggest by this definition of childhood disability that every child need be especially evaluated for functional limitations, or that this definition creates a supposition for any such examination. Under current procedures for writing individual listings, level of functioning is an explicit consideration in deciding which impairment, with certain medical or other findings, is of sufficient severity to be included in the Listing. Nonetheless, the conferees do not intend to limit the use of functional information, if reflecting sufficient severity and is [sic] otherwise appropriate.

The conferees contemplate that Congress may revisit the definition of childhood disability and the scope of benefits, if deemed appropriate, and have provided elsewhere for studies on these issues.

H.R. CONF. REP. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S. CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744) (emphasis supplied). Congress has created a Commission of Childhood Disability to further study the appropriateness of an alternative definition of childhood disability. *See* SEN. REP. No. 105–36(II), 105th Cong., 1st Sess.1997 (available on Westlaw at 1997 WL 374928 at 766).

**C.** ***The New "Functional Limitations" Standard for Childhood Disability***

**1. The New Act and Statute**

On August 22, 1996, the President signed into law the Personal Responsibility

(available on Westlaw at 1995 WL 709269 at 3875—76).

and Work Opportunity Reconciliation Act, Pub.L. No. 104–193, 110 Stat. 2105.[4] The Act amended the substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c (a)(3)(D). The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments. 42 U.S.C. § 1382c (a)(3)(G). In determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a qualified pediatrician or other specialist evaluates the case. 42 U.S.C. § 1382c (a)(3)(I).

Congress also chose to directly change specific sections of the Commissioner's childhood SSI regulations. Section 211(b) of the Act contains the following uncodified changes to the regulations:

(b) CHANGES TO CHILDHOOD SSI REGULATIONS.—

(1) MODIFICATION TO MEDICAL CRITERIA FOR EVALUATION OF MENTAL AND EMOTIONAL DISORDERS.—The Commissioner of Social Security shall modify sections 112.00C.2. and 112.02B.2.c.(2) of appendix 1 to subpart P of part 404 of title 20, Code of Federal Regulations, to eliminate references to maladaptive behavior in the domain of personal/behaviorial function.

(2) DISCONTINUANCE OF INDIVIDUALIZED FUNCTIONAL ASSESSMENT.—The Commissioner of Social Security shall discontinue the individualized functional assessment for children set forth in sections 416.924d and 416.924e of title 20, Code of Federal Regulations.

Pub.L. 104–193, 1996 H.R. 3734, 110 Stat. 2105, 2189.

Congress evidently intended to exercise direct control over the details of the implementing regulations, even though Congress normally leaves these to the discretion of the responsible agency. Pursuant to the Act, references to "maladaptive behavior" have since been removed from the regulations. *See* superseded text of §§ 112.00(C)(2)(c) and 112.02(B)(2)(c)(2) in Part 404, Subpart P, App. 1 and 2. Effective April 14, 1997, the Commissioner also removed 20 C.F.R. § 416.924d and § 416.924e pertaining to individualized functional assessment for children. Congress also required the Commissioner to submit to Congress for review any final regulation pertaining to the eligibility of

---

**4.** Section 211(d)(1) of the Act, Pub.L. 104–193, 1996 H.R. 3734, 110 Stat. 2105, 2190 (found in the notes following 42 U.S.C. § 1382c states that the new standard for evaluating children's disability claims applies to all cases which have not been finally adjudicated as of the effective date of the Act, August 22, 1996, including those cases in which a request for Appeals Council review is pending.) *See also, Brown v. Callahan,* 120 F.3d 1133, 1134—35 (10th Cir.1997); *Nelson v. Apfel,* 131 F.3d 1228, 1234—35 (7th Cir. 1997); *Jamerson v. Chater,* 112 F.3d 1064, 1065–66 (9th Cir.1997). Thus, the new version of the Act applies to this case.

children for SSI benefits. Pub.L. 104–193, § 211(d)(4), as amended Pub.L. 105–33, § 5101, 111 Stat. 595.

## 2. The New Regulations

Under express statutory authority, 42 U.S.C. § 405(a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Part 416, Subpart I; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir.1997). Effective April 14, 1997, the Commissioner promulgated detailed interim final rules to guide the implementation of the new statute. *See* Childhood Disability Provisions, 62 Fed. Reg. 6408 (1997); *accord, Nelson,* 131 F.3d at 1234—35. The new regulations are now in force, and are codified at 20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a.[5]

The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets or medically or functionally equals the severity of a listing in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)." 20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[6]

The regulations set forth the steps now used in determining disability for children. 20 C.F.R. § 416.924 (effective April 14, 1997):

> We follow a set order to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impair-

ments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a).

Individualized functional assessments for children have been eliminated. *See* Pub.L. 104–193, 1996 H.R. 3734, 110 Stat. 2105, 2189; 20 C.F.R. §§ 416.924d and 416.924e (discontinued). The Commissioner now applies a three-part test in determining a child's disability. The first determination is whether the child is working and performing substantial gainful activity. 20 C.F.R. § 416.924(b). If the child is not working, the Commissioner determines whether the child suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, the Commissioner then determines whether the child's impairments meet, medically equal, or functionally equal an impairment listed under Appendix I to Subpart P of Part 404. 20 C.F.R. § 416.924(d). The Commissioner evaluates age, functioning, and other factors in determining whether a child meets a listing. 20 C.F.R. §§ 416.924a—

---

**5.** The superseded text of all regulations appears in 20 C.F.R. following the revised text.

**6.** Part B provides medical criteria applicable to children in those instances in which Part A

does not give appropriate consideration to the particular disease process in childhood. *See* Parts A and B, Part 404, Subpart P, App. 1.

416.924c. Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a. Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning. 20 C.F.R. § 416.926a (b). There are six areas of functioning to be considered: cognition/communication ability; motor ability; social ability; responsiveness to stimuli (birth to age one only); personal ability (age three to age eighteen only); and concentration, persistence, or pace (age three to age eighteen only). 20 C.F.R. § 416.926a (c)(4).

▪▪▪ In a child disability case, the Commissioner must consider formal testing in evaluating a child's functioning.[7] An

---

7. The pertinent regulations provide:

(ii) The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

\* \* \* \* \* \*

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

\* \* \* \* \* \* .

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an 'extreme' limitation when you have a valid score that is three standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

\* \* \* \* \* \*

(4) How we will consider your test scores.

(i) [W]e will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain.

(ii) We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.

\* \* \* \* \* \*

(iii) If there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it. The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test. But it is also our responsibility to ensure that the evidence in your case is complete and consistent or that material inconsistencies have been resolved. Therefore, we will use the following guidelines when we resolve concerns about your test scores:

(A) We may be able to resolve the inconsistency with the information we have. We may need to obtain additional information; e.g., by recontact with your medical source(s), by purchase of a consultative examination to provide further medical information, by recontact with a medical source who provided a consultative examination, or by questioning individuals familiar with your day-to-day functioning.

(B) Generally, we will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning. When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision.

20 C.F.R. §§ 416.926a(e)(1)(ii), 416.926a(e)(2)(iii); 416.926a(e)(3)(iii), and 416.926(e)(4) (emphasis added).

"extreme" limitation is present when standardized tests contained in the record are used as the measure of functional abilities and contain a valid score three standard deviations [8] or more below the norm for the test, or when a child from age three to attainment of age eighteen has no meaningful function in a given area. 20 C.F.R. § 416.926a (c)(3)(ii)(A), (C). A "marked" limitation is present when the standardized tests contained in the record are used as the measure of functional abilities and contain a valid score two standard deviations or more (but less than three) below the norm for the test, or in a child from age three to attainment of age eighteen, when the degree of limitation "seriously" interferes with the child's ability to function. 20 C.F.R. § 416.926a (c)(3)(i)(A), (C). An ALJ who fails to determine the significance of a child's obviously low scores on standardized testing, acts contrary to the above regulations and to his basic duty to fully develop the record. *See Borgens v. Halter*, 164 F.Supp.2d 1309 (M.D.Fla. 2001)); citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir.1981).

### 3. Is the New Standard More Stringent?

The Commissioner takes the position that the new legislation adopts a stricter standard for disability in child SSI claims. Docket No. 13 at 2, 5—7. Indeed, the United States Court of Appeals for the Eleventh Circuit has agreed that the new law tightens rather than expands the definition of "disabled" with respect to children under 18, with the result that any child considered not disabled under the old law is necessarily considered not disabled under the new law as well. *Wilson v. Apfel*, 179 F.3d 1276, 1277—78 (11th Cir. 1999) citing *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir.1997); *Jamerson v. Chater*, 112 F.3d 1064, 1065–66 (9th Cir.1997).[9]

8. The standard deviation figure describes the probability that the measured disparity is the result of mere chance. *Engineering Contractors Ass'n of S. Fla. Inc. v. Metropolitan Dade County*, 122 F.3d 895, 914 (11th Cir.1997).

9. Under prior law and the regulations thereunder, the analysis for whether a child was disabled entailed four sequential steps. *Wilson*, 179 F.3d at 1278 n. 1. The first question was whether the claimant was engaged in substantial gainful activity. If yes, she was not disabled. If no, the second question was whether the claimant had a severe impairment. If no, she was not disabled. If yes, the third question was whether the impairment met or equaled an impairment, also known as a "Listing," in appendix 1 of 20 C.F.R. pt. 404, subpt. P. If yes, the child was conclusively disabled. If no, the child could still be disabled if the fourth step was answered in the affirmative: whether the claimant had an impairment of "comparable severity" to that which would prevent an adult from engaging in substantial activity. *Wilson*, 179 F.3d at 1278 n. 1.

The effect of the 1996 legislation was to remove the fourth step. *Wilson*, 179 F.3d at

1278 n. 1. The fourth step had essentially provided an alternative way for a child to establish that she was disabled. The 1996 legislation truncated the sequential analysis by cutting off the fourth step, so that if the child's impairment failed to meet or equal one of the Listings, the child would be conclusively adjudged not disabled. *Wilson*, 179 F.3d at 1278 n. 1. As amended, the relevant statutory provision states: "An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c (a)(3)(C)(i). *The regulations promulgated following the 1996 statute preserved the first three steps in the sequential analysis, which continued to reflect properly the statutory language in subparagraph (i) coupled with the proviso in subparagraph (ii) that no child engaged in substantial gainful activity may be considered disabled. *See* 20 C.F.R. § 416.924(a); *Wilson*, 179 F.3d at 1278 n. 1.

Other courts of appeals have accepted the Commissioner's argument that the new law is "more stringent," and have affirmed disability denials under the new law after finding that the ALJ had properly applied the old law.[10]

 A district court normally will defer to an agency's reasonable interpretation. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Courts have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer); *accord, Jamerson v. Chater*, 112 F.3d 1064, 1065—66 (9th Cir.1997); *Nelson*, 131 F.3d at 1234—35. A district court will not defer, however, if the agency's interpretation is manifestly contrary to the statutory standard that the regulations purport to implement. *Sullivan v. Zebley*, 493 U.S. 521, 528, 541, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Commissioner's pre–1990 childhood disability regulations did not carry out the requirement in the former statute that SSI benefits shall be provided to children with any impairment of comparable severity).

## D. *The Evaluation of Mental Disorders*

The structure of the mental disorders listings for children under age 19 parallel the structure of the mental disorders listings for adults, but it is modified to reflect the presentation of mental disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation applicable to children. The listing for mental disorders in children are arranged in eleven diagnostic categories, including attention deficit hyperactivity disorder (112.11). 20 C.F.R. Pt. 404, Subpt. P, App. 1. A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (motor function, cognitive/communicative function, social function; personal function, and concentration, persistence, or pace). 20 C.F.R. Pt.404,

---

10. *See Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. April 9, 1998) (claimant properly denied benefits under old, less restrictive standard); *Briggs v. Callahan*, 139 F.3d 606 (8th Cir. 1998) (legislative history indicates that new statutory definition imposes a more stringent standard for disability); *Nelson v. Apfel*, 131 F.3d 1228, 1234—35 (7th Cir.1997) (court of appeals defers to agency's reasonable interpretation that a claimant who was properly denied benefits under old standard would also be denied benefits under the new standard); *Lee v. Chater*, No. 96–3613, 1997 WL 559959, at *1 n. 1 (7th Cir.1997) (unpublished decision in table at 124 F.3d 204) (citing SSA Emergency Teletype No. EM–96–131, court of appeals finds new definition of disability more stringent than the old); *Brown v. Callahan*,

120 F.3d 1133, 1135 (10th Cir.1997) (analysis on appeal stops after finding substantial evidence supporting ALJ's findings on first three steps because new version eliminates the fourth step: comparable severity); *Jamerson v. Chater*, 112 F.3d 1064, 1066, 1068 (9th Cir.1997) (citing SSA Emergency Teletype No. EM–96–131, court of appeals defers to agency's reasonable interpretation that the new standard is "more demanding" and "more stringent," but declines to interpret the precise effect of the new standard in advance of the impending rules); *see also, Quinones v. Chater*, 117 F.3d 29, 33 n. 1 (2d Cir.1997) (Commissioner waived any argument regarding applicability of new childhood disability definition to this case because he had not yet promulgated the new regulations).

Subpt. P, App. 1. In most functional areas, there are two alternative methods of documenting the required level of severity: 1.) use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other medical findings. *Id.* The use of standardized tests is the preferred method of documentation if such tests are available. *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal, social, cognitive/communicative functioning, and concentration, persistence and pace. This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases, descriptions of the child's activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these children's sustained ability to function. It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress. 20

C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the child either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in children with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594(iv).

The Listing for Attention Deficit Hyperactivity Disorder, 20 C.F.R. § Pt. 404, Subpt. P.App. 1, § 112.11, requires:

A. Medically documented findings of all three of the following:

1. Marked inattention; and
2. Marked impulsiveness; and
3. Marked hyperactivity;

AND

B. . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P.App.1, § 112.11. For children (age 3 to attainment of age 18), Paragraph B2 of 112.02 requires at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02 B. 2.

An individual may meet the separate Listing for mental retardation if she has a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other

mental impairment imposing additional and significant work–related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

### E. *Treating Physicians*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1439—1441 (11th Cir.1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D.Fla.1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir.1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir.1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

### F. *Developing the Record*

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir.1988); *Cowart v. Schweiker*, 662 F.2d 731, 735—36 (11th Cir.1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C. § 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735—

36. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala,* 44 F.3d 931, 934—35 (11th Cir.1995), *citing Smith v. Schweiker,* 677 F.2d 826, 829 (11th Cir.1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart,* 662 F.2d at 735 (citations omitted).

### G. *Medical Tests and Examinations*

 The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowen,* 781 F.2d 143, 146 (8th Cir.1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir.1988); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

### H. *Credibility*

 Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561–62; *Jones v. Department of Health and Human Services,* 941 F.2d 1529, 1532 (11th Cir.1991) (articu-

lated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561–62; *Cannon v. Bowen,* 858 F.2d 1541, 1545 (11th Cir.1988).

 A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker,* 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater,* 67 F.3d at 1562 (quoting *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir.1983)) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V. *APPLICATION AND ANALYSIS*

### A. *The Facts*

On March 3, 1993, when Jennifer was six-and-one-half years old, Eileen Sheehy, M.D. of North Broadway Medical Associates performed a learning disability evaluation on Jennifer. R. 199—200. Dr. Sheehy found that Jennifer was unable to give her address and phone number. When asked to write her name, Jennifer reversed her n's and spelled her last name incorrectly. She was unable to write her numbers past the number five. She could count to five easily, but was unable to write her letters (she could sing the

ABC's). She appeared to have a learning disability. R. 199—200.

On May 18, 1993, Michael F. Kirschner, Ph.D., administered to Jennifer a Weschler Intelligence Scale for children. Jennifer had a Verbal IQ of 71, a Performance IQ of 84, and a Full Scale of 76. The doctor observed that her mother was a recovering alcoholic who was incarcerated in a rehabilitation facility on Staten Island, and that her father's whereabouts were unknown. Jennifer spoke spontaneously and was understood, despite the presence of a speech articulation disorder. Jennifer demonstrated expressive language dysfunction including transpositions, poor word identification, syntax and word retrieval deficits.

Dr. Kirschner noted that Jennifer functioned at the borderline defective level intellectually. Verbal functioning was also borderline defective, while performance skills were low average. Her ability to visually discriminate detail was average. Tests measuring Jennifer's ability to learn a rote graphomotor task, ability to perceive and integrate spatial relationships, ability to assemble objects, and ability to engage in arithmetic reasoning were low average. Jennifer's conceptual reasoning facility, vocabulary knowledge, ability to recall auditorily presented information and to organize and sequence information using social cues were borderline defective. Her fund of general knowledge and social judgment were defective. Jennifer's overall performance reflected significant cognitive deficits.

According to Dr. Kirschner, Jennifer functioned intellectually at the borderline level overall, but some relative subtest strengths suggested that she possesses low average to average potential. Dr. Kirschner felt that her performance skills were superior to her verbal functioning, that Jennifer's learning disability was language based, and that the auditory modality was significantly weaker than the visual modality. Dr. Kirschner found that Jennifer required special education support services focusing upon languages development. R. 201—02.

On August 25, 1997, Deveraux Orlando Treatment Network conducted a psychiatric evaluation of Jennifer. R. 238—40. Jennifer was eleven. Jennifer was hyperactive and had a short attention span. Fontanez, Jennifer's grandmother / guardian, reported that Jennifer had emotional problems, that she isolates herself a lot and cries, that she rocks frequently, that she has difficulty sleeping, that she bangs her head before getting to sleep, and that she is a slow learner. Fontanez also reported that Jennifer undergoes psychological testing in school, and has difficulties concentrating in school. According to Fontanez, Jennifer is very jealous and competitive, restless, unable to sit still, has a poor memory, and needs instructions to be repeated. Jennifer has been on Ritalin for the past two years. Jennifer does not take responsibility for her actions, and is sad frequently. According to Fontanez, her sleep is very restless, and she sometimes wakes up in the middle of the night screaming.

Jennifer was very quiet during her mental examination. She was looking down most of the time. She related superficially with the clinician, and was mildly cooperative. Her psychomotor activity level was retarded, and her mood was depressed. Jennifer admitted to feeling sad. When asked what made her sad, she reported that she was sad about school. When asked what subject she does not like, she just shrugged her shoulders. When asked to make three wishes, she said "I don't know." Her intellectual ability appeared to be below average. Her attention, concentration, and memory were poor. Her insight and judgment were poor. The im-

pression was an eleven-year-old Hispanic female with a history of learning disabilities.

Jennifer's parents were substance abusers, and Jennifer had been taken away from them. She appeared very depressed. The diagnosis was Dysthymia (rule out Attention Deficit Hyperactivity Disorder; Rule out Mental Retardation) with a history of sickle cell anemia. The severity of psycho-social stressors resulted in a Global Assessment of Functioning ["GAF"] of 55. R. 238—40.[11]

On September 18, 1997, Jennifer was evaluated on follow up. Jennifer was the same. She was still depressed, having crying spells, and is still feeling anxious. R. 237. On October 22, 1997, Fontanez reported that Jennifer had been doing fairly well in school, but that her teacher reported that she would receive an F. Jennifer reported that, at times in school she would stare into space, and there were times when she does not remember what is happening around her. Her mood was dysphoric and her affect constricted. R. 236.

On December 3, 1997, the medical record notes no significant changes in Jennifer's behaviors. Her mood was slightly anxious. She did not say much. Her sleep and appetite were fair. R. 234. On January 21, 1998, Fontanez brought Jennifer in and reported that she had been getting into trouble in school. She got into a fight and was suspended from school, which she admitted.. R. 233. On July 2, 1998, the doctor noted that Jennifer carried a diagnosis of Dysthymic Disorder, was 12 years old, and had been treated with Imipramine and Ritalin. Jennifer's

case was then closed because Fontanez had problems due to transportation. R. 226.

Fontanez testified at the hearing before the ALJ. She testified that Jennifer was eleven years old and in fourth grade. According to her grandmother, Jennifer is hyperactive, and takes Imipramine and Ritalin, R. 30. Fontanez monitors her granddaughter's medication. Jennifer, sometimes she goes through depression, and sometimes she gets along with other children. Jennifer has not been suspended, but she gets notes that she is misbehaving sometimes at school. R. 31. She likes to play basketball. She has problems with her speech, and attends special language instruction. Dr. Lopez has seen her once a month for her hyperactivity and her depression. Dr. Durand is her counselor and gives her therapy. She does have problems with insomnia, and exhibits repetitive behaviors like rocking back and forth, R. 33, and hitting her head against the wall. Her memory is very limited.

On April 13, 1998, Frank A. Lopez, M.D. saw Jennifer at the Children's Developmental Center. R. 241—43. He noted that:

at her visit on 11/11/97, a Visual Motor Integration Test was obtained and showed a raw score of 16, a standard score of 79 and a percentile rank of 8. Her test of Auditory Analysis Skills showed her to have a third grade level (where she was currently placed at the time of the test). Also a Kaufman Brief Intelligence Test was obtained at that visit and showed a vocabulary score of 55 +/7 pts., Matrices score of 73 +/9

---

11. The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM– IV at 32. A GAF code of 51—60 indicates moderate symptoms, or moderate impairment in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed.1994) [hereinafter "DSM–IV"] at 32.

**1356**

pts., with a 90% band of confidence. Her overall score was 60 +/7 pts., placing her in the Mild Mentally Retarded range. It is our feeling that the scores, especially in the vocabulary, were due to severe LD rather than a true mental retardation picture.

R. 241.

### B. *The Analysis*

Fontanez does not argue that the Commissioner's new childhood disability regulations have failed to implement the statute enacted by Congress; that the new regulations are manifestly contrary to the statute; or that the new regulations exceed the Commissioner's statutory authority. Neither does Fontanez argue that the Commissioner's listings-only approach to child disability is more restrictive and severe than the new child disability standard enacted by Congress.[12] Accordingly, the Court does not address those issues, and defers to the agency's interpretation in this case.

Rather, Fontanez's principal contention is that the Commissioner erred by determining that Jennifer had a moderate limitation of her cognitive/ communicative functioning, and a slight limitation in her concentration. Actually, the ALJ found

that Jennifer had "at best, *moderate* limitations in cognitive and social functioning, *as well as* in concentration, persistence and pace." R. 13 and Finding 5 (emphasis supplied). The Commissioner argues that the ALJ properly found that Jennifer was doing better with medication management with no reported side-effects, that her attention deficit hyperactivity disorder was becoming stable, that she was doing better in school, and that her dysthymia was lessening. R. 11—13, 226—40, 242. Accordingly, the Commissioner argues that the ALJ properly found that Jennifer was no longer disabled as of the cessation date of June 1, 1997. R. 11, 13.

■ The ALJ was to consider five areas of Jennifer's functioning: cognition/ communication ability; motor ability; social ability; personal ability; and concentration, persistence, or pace. To functionally equal a listed impairment, Jennifer must demonstrate one "extreme" limitation in one area of functioning, or show a "marked" limitation in two areas of functioning. The ALJ does not explain why he found that Jennifer's limitations are "moderate" and not "marked," particularly Jennifer's limitations in cognitive and social functioning, and in concentration, persis-

---

**12.** Which version of the statute is "more stringent" is not readily apparent from a comparison of the old and new statutory language. Without considering more than the statutory language, one cannot determine which is more severe: 1.) an "impairment of comparable severity" to that which would prevent an adult from engaging in substantial gainful activity; or 2.) an "impairment which results in marked and severe functional limitations." *See* 42 U.S.C. § 1382c (a)(3)(C). It is, however, readily apparent that the new implementing regulations are generally more "severe" than the old post-*Zebley* regulations. *See Wilson v. Apfel,* 179 F.3d 1276, 1277—78 (11th Cir.1999). The Commissioner has discarded the "comparable severity" regulations and the post-*Zebley* individualized functional assessment, 20 C.F.R. §§ 416.924d and 416.924e,

and has replaced those regulations with new ones that should implement the new "marked and severe functional limitations" standard directed by Congress. Level of functioning in children is an explicit consideration in deciding which impairment is of sufficient severity to be included in an individual listing. H.R. CONF. REP. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S. CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744). Functional equivalence is a criterion in crafting the Listing of Impairments so as to ensure the proper consideration of disability in children. *Id.* The new regulations expressly direct the assessment of functional equivalence for children whose impairments do not meet or equal in severity a listed impairment. 20 C.F.R. § 416.926a.

tence and pace, Indeed, if one were to credit Jennifer's grandmother [13] and treating physicians, Dr. Frank A. Lopez, M.D, and the Deveraux Orlando Treatment Network, Jennifer's learning disability is severe. She rocks back and forth, and hits her head against the wall. Rather than improving after June 1, 1997, her learning disability and dysthymia appear to have become worse.

The ALJ had a duty to fully and fairly develop the record as to Jennifer's impairments so that he could determine whether they functionally equal a Listing. Here, the ALJ had a special duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts and to be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited. The record does not contain sufficient information from Jennifer's medical sources to determine whether Jennifer functionally equaled a Listing.

 The record contains limited evidence of formal testing. On May 18, 1993, Michael F. Kirschner, Ph.D., administered to Jennifer a Weschler Intelligence Scale for children. On November 11, 1997, Frank A. Lopez, M.D. at the Children's Developmental Center performed a Visual Motor Integration Test, an Auditory Analysis Skills test, and a Kaufman Brief Intelligence Test. R. 241—43. This formal testing, however, did not provide the ALJ

(and the district court) with adequate information about Jennifer's functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Her standard scores were not converted to standard deviations so as to be useful in determining whether Jennifer had a "marked" or "extreme" limitation in a domain. Absent standardized tests that measure functional abilities in terms of standard deviations, a judge cannot usually determine the presence or absence of an "extreme" or "marked" limitation.[14] Contrary to his duty to fully develop the record, the ALJ failed to determine the significance of Jennifer's low scores. This requires remand.

Second, Fontanez contends that the Commissioner erred by failing to find that Jennifer had a severe impairment. Although the body of the ALJ's decision discusses severity only in terms of an overall "improvement" in Jennifer's dysthymic disorder, attention deficit hyperactivity disorder, and specific learning disorder, R. 11,[15] he ultimately concludes that Jennifer's impairments were "severe." R. 13, Finding 3. The ALJ did not err in so finding.

Third, Fontanez contends that the Commissioner erred by failing to consider and evaluate the combined effect of all of Jennifer's impairments in determining severity. As stated before, the ALJ considered Jennifer's combined impairments "severe." R. 13, Finding 3. Although the record is

---

**13.** The ALJ did not find the grandmother's testimony to have been credible. Specifically, the ALJ found that "[s]ubjective allegations and testimony are not fully credible considering medical and other evidence of record." R. 13, Finding 6. Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. The ALJ did not articulate specific and adequate reasons for not crediting Fontanez's testimony. The reasons are not obvious from the medical record.

**14.** Jennifer may have a "marked" limitation if her standardized tests show a valid score two standard deviations or more below the norm for the test, or if the degree of Jennifer's limitation "seriously" interferes with her ability to function.

**15.** The ALJ found that, in view of her progressive improvement, "the severity of claimant's impairments and resulting limitations are no longer disabling." R. 13.

**1358**

slim on evaluation, the ALJ seems to have looked at Jennifer's dysthymic disorder, attention deficit hyperactivity disorder, and specific learning disorder together. R. 11, 13. The ALJ did not err in doing so.

Fourth, Fontanez contends that the Commissioner erred by failing to consider the combined effect of Jennifer's impairments in determining whether her impairment equaled a listing. To the extent that the ALJ looked at Jennifer's impairments in determining whether she met, medically equaled, or functionally equaled the Listings, he looked at her impairments in combination. Fontanez's real argument is that the ALJ did not properly assess functional equivalence in light of Jennifer's impairments, as previously discussed. The ALJ did, however, properly considered the combined effect of Jennifer's impairments.

## VI. *CONCLUSION*

For the reasons stated above, the decision of the Commissioner should be **REVERSED and REMANDED under Sentence Four** for proceedings not inconsistent with this opinion.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within eleven days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Any party appealing this decision shall file and serve a copy of the oral argument transcript.

Aug. 13, 2001.